| | |
|---|---|
| **District Court, Adams County, State of Colorado**<br>Adams County Justice Center<br>1100 Judicial Center Drive, Brighton, CO 80601 | DATE FILED: May 22, 2019 7:37 PM<br>FILING ID: 87C73E4154AAC<br>CASE NUMBER: 2019CV30808 |
| JONATHAN CARTER,<br>            Plaintiff<br>v.<br>SONIC CORPORATION,<br>SONIC RESTAURANTS, INC., and<br>SONIC INDUSTRIES SERVICES INC.,<br>            Defendants. | ▲ COURT USE ONLY ▲ |
| Attorneys for Plaintiff:<br>Paula Greisen (#19784)<br>Jennifer Weiser Bezoza (#40662)<br>Jonathan Freund (#52591)<br>KING & GREISEN, LLP<br>1670 York Street, Denver, CO 80026<br>(303) 298-9878 (phone)<br>(303) 298-9879 (fax)<br>greisen@kinggreisen.com; bezoza@kinggreisen.com;<br>freund@kinggreisen.com | Case Number:<br><br>Division         Courtroom |
| **COMPLAINT AND JURY DEMAND** ||

Plaintiff Jonathan Carter ("Jonathan" or "Plaintiff"), by and through his attorneys Paula Greisen, Jennifer Weiser Bezoza, and Jonathan Freund of KING & GREISEN, LLP, submits this Complaint and Jury Demand against Defendants Sonic Corporation, Sonic Restaurants, Inc., and Sonic Industries Services Inc. (collectively, "Sonic" or "Defendants"), as follows:

## I. INTRODUCTION

1.      On June 11, 2017, Sonic intentionally aided and abetted an assault on an employee by giving a known violent and armed assailant, whom Sonic knew was angry at one of its employees, direct access to a secure, employee-only area of its restaurant.

2.      Sonic's management then watched and listened as the assailant held a loaded gun to the employee's head and threatened to kill him.

3.      Although Sonic knew or had reason to know that its management was routinely violating company policy by allowing third parties to enter into secure, employee-only areas, it failed to exercise reasonable care to protect its employees against this known danger.

## II. JURISDICTION AND VENUE

4. The action arises under the laws of the State of Colorado.

5. Jurisdiction is proper pursuant to C.R.S. § 13-1-124 based on Defendants' commission of tortious acts within the State of Colorado.

6. Venue is proper in this Court under C.R.C.P. Rule 98(a) because this action affects real property situated in Adams County, Colorado. The real property at issue is 9500 North Federal Boulevard, Federal Heights, Colorado 80260 ("9500 North Federal Boulevard").

7. Venue is also proper in this Court under C.R.C.P. Rule 98(c)(5) because this action involves torts committed in Adams County, Colorado.

## III. PARTIES

8. Plaintiff Jonathan Carter is a natural person, a citizen of the United States of America, and is and was a resident of the State of Colorado during all relevant time periods. Jonathan is currently twenty-six years old and was an employee at the Sonic Drive-In restaurant at 9500 North Federal Boulevard (the "Federal Heights Sonic Drive-In") in 2017.

9. Defendant Sonic Corporation ("Sonic Corp.") (a/k/a SONIC America's Drive-In) is a corporation incorporated under the laws of the State of Delaware. Its principal place of business is 300 Johnny Bench Drive, Oklahoma City, OK 73104. During all relevant time periods, Sonic Corp. was a publicly traded company. Sonic Corp. has more than ten subsidiary companies.

10. During all relevant time periods, Sonic Corp. owned, operated, or franchised approximately 3,600 drive-in restaurants in forty-five states. Of these, approximately 228 restaurants were owned and operated by Sonic Corp. or its subsidiaries (the "Company Drive-Ins").

11. Defendant Sonic Restaurants, Inc. ("SRI") is a corporation incorporated under the laws of the State of Oklahoma. Its principal place of business is 300 Johnny Beach Drive, Oklahoma City, OK 73104. SRI is a wholly owned operating subsidiary of Sonic Corp.

12. During all relevant time periods, SRI owned and operated the Company Drive-Ins for Sonic Corp., including the Federal Heights Sonic Drive-In.

13. As the owner and operator of the Federal Heights Sonic Drive-In, Sonic Corp. and SRI have possession of the property and control and responsibility over the conditions, circumstances, and activities taking place on the property.

14. Defendant Sonic Industries Services Inc. ("Sonic Industries Services") is a corporation incorporated under the laws of the State of Oklahoma. Its principal place of business

2

is 300 Johnny Bench Drive, Oklahoma City, OK 73104. Sonic Industries Services is a wholly owned subsidiary of Sonic Corp.

15. Sonic Industries Services leases real estate to Sonic Corp.'s Company Drive-Ins, including the Federal Heights Sonic Drive-In. Upon information and belief, Sonic Industries Services sub-leased the property at 9500 North Federal Boulevard to SRI.

16. Upon information and belief, Sonic Industries Services retained some possession and control over the conditions on the property of the Federal Heights Sonic Drive-In and conducted activities on the land.

17. Plaintiff's direct manager was Ashley Shevlin. As a manager, Shevlin was an agent of Sonic.

18. Shevlin was responsible for hiring Plaintiff as an employee at the Federal Heights Sonic Drive-In and had the authority to fire him.

19. Shevlin reported to District Manager Ronald Alvarez, who holds himself out as an employee of Sonic Corp. Alvarez was responsible for overseeing all conditions and operations at the Federal Heights Sonic Drive-In, including Plaintiff's complaints about the events at issue in this Complaint. Plaintiff consulted with Alvarez regarding questions about his employment.

20. Sonic Corp. and SRI provide customer service and management training, field services, quality assurance, marketing, operations support, legal services, risk management, finance, food safety, and real estate support for all Sonic Drive-In restaurants, including the Federal Heights Sonic Drive-In. For example, they provide a 12-week operations/field training program; access to online hiring management tools; online/onsite recruitment materials and onboarding/performance management tools; staff selection training; marketing materials; a national purchasing program; technology; architectural, construction and engineering consultation and assistance; and advertising.

21. With respect to real estate development, all Sonic Defendants jointly evaluate real estate sites, determine site viability, and develop their sites by providing building design and engineering support, bid review and comparison, construction project management guidance, and assistance with the development of a construction schedule timeline and a preferred vendor list.

22. Sonic Corp. maintains centralized financial and accounting systems for all Company Drive-Ins operated by SRI, including the Federal Heights Sonic Drive-In.

23. At all relevant times, Sonic Corp. reported the profits, losses, and assets (including leases) of Company Drive-Ins operated by SRI as the profits, losses, and assets of Sonic Corp.

24. Sonic Corp. and SRI have centralized control over labor relations at Sonic Drive-In restaurants, including the Federal Heights Sonic Drive-In. Plaintiff's paycheck was issued by

SRI, he was hired by an agent of SRI, and his claim for damages for the injuries claimed herein was handled by an agent of SRI. Sonic Corp. maintains a uniform compensation plan for all managers and supervisors at Company Drive-Ins operated by SRI.

25. At all relevant times, the financial statements of Sonic Corp. described all part-time and full-time employees at Company Drive-Ins operated by SRI as employees of Sonic Corp.

26. Sonic's management team consists of representatives from both Sonic Corp. and SRI.

27. Employees at the Federal Heights Sonic Drive-In were subject to the operational policies, procedures, standards, and other conditions of employment of Sonic Corp., SRI, and Sonic Industries Services.

28. Sonic Corp., SRI, and Sonic Industries Services operate as a single integrated enterprise and/or as joint employers with inter-related operations, ownership, and management.

## IV.  FACTUAL ALLEGATIONS

29. On June 11, 2017, Jonathan Carter was working as a cook at the Federal Heights Sonic Drive-In located at 9500 North Federal Boulevard.

30. There was only one other employee at the restaurant with him that day as well as Jonathan's manager, Ashley Shevlin, who was supervising both employees.

31. Like most other Sonic restaurants, the Federal Heights Sonic Drive-In consists of a small, employee-only building and a series of vehicle stalls for customers. Food is prepared in the employee-only building and brought outside to the customers in their cars. All food service occurs outside of the building.

32. During the relevant times, the Federal Heights Sonic Drive-In employee-only building consisted of two areas separated by a short corridor but no door. The front area was enclosed by glass and held the restaurant's ice cream machine, soda machine, and computer. The back area had no windows and contained the kitchen with the grill and fryers and storage closets. There was a back door in the kitchen area that led outside and was used for deliveries and trash removal.

33. Sonic's policy prohibits customers and non-employees from entering the restaurant's employee-only building.

34. At all relevant times, Sonic's policy for the security of its employees was that the doors to the employee-only building must remain locked during business hours. The front door to the building has an electronic combination key pad for access. The back door to the kitchen required a key for access.

35. Sonic established this locked-door policy, among other reasons, to ensure the safety of its employees and invitees against the known risk of crime. As Sonic knew or should have known, the violent crime rate in the City of Federal Heights, where the Federal Heights Sonic Drive-In is located, was 88% higher than Colorado's average violent crime rate in 2016. In particular, the City of Federal Heights experienced 51 Aggravated Assaults and 18 Robberies in 2016.

36. Against the security interest of its employees and invitees, Sonic's management regularly permitted non-employees to enter the restaurant's secure, employee-only building and sometimes allowed them into the kitchen area. It was widely known that the Federal Heights Sonic Drive-In's management routinely allowed non-employees into secure and restricted areas of the restaurant.

37. Given the high crime rate in the City of Federal Heights, Sonic management's regular practice of leaving the front door unlocked and granting third parties access to the secure, employee-only building created an unreasonable risk to the health or safety of the employees of the Federal Heights Sonic Drive-In.

38. Sonic knew or should have known that its management regularly violated its policies and created a risk of harm to its employees by permitting non-employees to enter the restaurant's secure, employee-only areas. There are security cameras in the restaurant which would have shown this policy violation. In addition, Sonic's District Manager and other Sonic agents and representatives were periodically onsite to manage the property and/or operations of the restaurant or to provide services to the restaurant, and these agents knew or should have known that Sonic's management regularly violated Sonic's safety policies.

39. Despite knowing that third parties were permitted access to secure, employee-only areas of the Federal Heights Sonic Drive-In, Sonic did not take action to address the policy violation, thereby creating and permitting a dangerous condition to exist at the restaurant.

40. In June 2017, Jonathan Carter, an employee of the Federal Heights Sonic Drive-In, wrote a comment to a video posted on Facebook. The video showed an unknown person doing a comedy routine. Jonathan commented that the person in the video resembled the husband of another Sonic employee and tagged his manager, Shevlin, in the post so that she could enjoy the joke.

41. On the morning of June 11, 2017, Jonathan was working at the Federal Heights Sonic Drive-In when Sonic's management told him that Andre Lornes, her fiancé and the father of her unborn child, was angry that Jonathan had tagged her in the Facebook post.

42. Sonic's management told Jonathan that Lornes was coming to the restaurant to confront Jonathan about the post but did not provide any further details about the purpose of his visit or his state of mind.

43. Sonic's management knew that the intent of Lornes's visit to the restaurant was to harm Jonathan and that Lornes possessed a handgun.

44. Sonic knew that Lornes has a propensity for violence because Lornes was formerly employed by Sonic, and Sonic had fired Lornes for inability to control his anger.

45. Sonic knew or should have known that Lornes was a member of a violent gang.

46. Sonic knew or should have known that Lornes had previously been convicted of five felonies, including Aggravated Motor Vehicle Theft, Attempted Burglary, and Racketeering.

47. On June 11, 2017, at around 12 P.M., Lornes arrived at the Federal Heights Sonic Drive-In. Despite knowing that Lornes had a propensity for violence and intended to harm Jonathan, Sonic's management opened the door and allowed Lornes to enter the secure, employee-only building where Jonathan was working. Once he was inside the building, Lornes and Sonic's management had a brief conversation at the computer in front of the store's security cameras.

48. Sonic's management then allowed Lornes to enter the kitchen area where management knew Jonathan was working.

49. Sonic's management did not warn Jonathan that a person who intended to harm him was inside the restaurant's secure building.

50. Lornes walked to the back of the kitchen area and started calling Jonathan's name. Jonathan became worried when he recognized Lornes's voice from prior visits to the restaurant.

51. When Lornes found Jonathan, he pulled a semi-automatic handgun out of his sock, took the clip and ammunition magazine out of his pants pocket, and loaded the gun. He then took the safety catch off the gun and loaded a live bullet into the chamber.

52. Lornes pointed the barrel of the gun at Jonathan's face, holding it approximately six inches away, and yelled very loudly, "Why you keep disrespecting my wife?!" Jonathan, trembling in shock and fear, asked what he was talking about, but Lornes kept screaming, "Why you keep disrespecting my wife?!"

53. Another employee, who was also aware of Lornes's propensity for violence because the two men were formerly incarcerated together, warned Jonathan not to question or challenge Lornes. Jonathan stood motionless, barely able to breathe and completely terrified.

54. Still pointing the gun at Jonathan's face, Lornes threatened to kill Jonathan if he did not leave his "wife" alone. Slowly, Lornes then turned and walked out of the front door of the restaurant.

55. Still shaking, Jonathan grabbed his belongings and left the restaurant out the back door. He ran home and never returned to the restaurant in fear that he could lose his life if he went back.

56. Sonic's management was present in the restaurant during the assault and should have heard Lornes's screaming but took no action to protect Jonathan from the assault and death threats.

57. After aiding and abetting the assault on Jonathan, Sonic's management allowed Lornes to leave the building without questioning or detaining him.

58. Sonic did not call the police or otherwise report the assault.

59. Jonathan hid in his bedroom for the next three days, afraid to go outside or tell anyone about the assault.

60. On or around June 14, 2017, Jonathan reported the assault to the police, Sonic's District Manager, and Sonic's corporate office. Jonathan later asked the District Manager, Ronald Alvarez, whether there was video surveillance of the assault. Sonic's District Manager denied that there were video recordings of the assault.

61. When police detectives contacted Sonic to investigate the crime, Sonic did not respond to officer phone calls and was evasive about providing information to the detective, thereby impeding the investigation into the assault on one of its employees.

62. Alvarez, Sonic's District Manager, ultimately told a police detective that he had viewed security video from the day in question. He claimed that the video did not capture the area of the restaurant where the assault occurred, but did show the front of the building and the front door. Alvarez then claimed that the video equipment had "malfunctioned" after he and Shevlin watched the video, causing all footage of June 11, 2017 to be erased. Alvarez refused to provide the allegedly damaged video to the police or to provide a written statement regarding the video, as requested.

63. When the police detective went to the restaurant to inspect the site, he was told that the camera in the area of the assault was "not working."

64. Lornes was convicted for his assault on Jonathan and other related crimes.

65. The assault caused Jonathan to suffer economic and emotional damages. He was severely traumatized by the assault, resulting in lasting emotional disturbance with physical manifestations, including but not limited to nausea, dizziness, heaviness in his chest, the feeling of a lump in his throat, weight loss, and loss of appetite.

66. Shortly after the assault, Jonathan was diagnosed with Post Traumatic Stress Disorder. His symptoms include difficulty sleeping, nightmares, weight loss, anxiety, and

significant isolation and social withdrawal. Jonathan's impairment continues to cause him daily mental anguish. He still suffers significant anxiety when he leaves his home or interacts with others.

67. The assault did not have its origins in Jonathan's work-related functions and was not sufficiently related thereto as to be considered part of Jonathan's services to his employer.

68. Nothing about the nature of Jonathan's employment as a cook for the Federal Heights Sonic Drive-In involved being subjected to an armed assailant in a secure area of his workplace or permitted his employer to knowingly expose him to the violent acts of third parties.

69. Jonathan's job duties as a cook at the Federal Heights Drive-In did not increase his risk of emotional injury or assault by a third party above the level of risk to which the general public is exposed.

70. Jonathan's injuries were not reasonably incidental to the conditions or circumstances of his particular employment and did not emanate from his job duties.

71. Jonathan's injuries were not attributable to neutral and unexplained forces and were not distinctly associated with his employment. Lornes was a known violent "licensee" of the Defendants' agent and Defendants knew or should have known he was on the premises to assault Plaintiff.

72. Although Sonic knew or should have known that its management routinely allowed third parties to enter its secure, employee-only building, it failed to address the dangerous condition on its property, thereby intentionally and deliberately causing injury to Jonathan and other employees who witnessed the event.

73. Sonic knew that its conduct of granting third parties access to secure, employee-only areas of its restaurant was substantially certain to cause injury to its employees.

74. The assault on Jonathan would not have occurred if Sonic had not intentionally permitted Lornes to enter the secure, employee-only building.

75. Sonic's acts and omissions were a substantial factor in producing Jonathan's injuries.

76. Had Sonic enforced its policies of keeping the front door to the restaurant locked during business hours and not permitting third parties to access the employee-only building rather than knowingly and intentionally ignoring management's regular disregard of these policies, Jonathan would not have suffered the injuries complained of herein.

## V.  LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### Premises Liability Act ("PLA"), Colo. Rev. Stat. 13-21-115 (Against all Defendants)

77.  Plaintiff incorporates by reference all allegations in each preceding and subsequent paragraph as if fully set forth herein.

78.  On or about June 11, 2017, Plaintiff was present at the Federal Heights Sonic Drive-In as an employee transacting business with Defendants. As such, Plaintiff was an "invitee" pursuant to Colo. Rev. Stat. § 13-21-115(5)(a).

79.  On or about June 11, 2017, Defendants were each a "landowner" of the Federal Heights Sonic Drive-In pursuant to Colo. Rev. Stat. § 13-21-115(1), in that Defendants or their authorized agents were in possession of the property and/or had control and legal responsibility over the conditions, circumstances, and activities taking place on the property.

80.  Defendants, as landowners, owed a duty of care to Plaintiff to exercise reasonable care to protect him against dangerous conditions, circumstances, or activities on the premises, including but not limited to criminal and/or intentionally harmful acts, of which they knew or should have known.  That duty of care includes supervising its employees and the premises to make sure invitees are safe.

81.  Defendants' duty to Plaintiff to exercise reasonable care is non-delegable and, as a matter of law, imposes liability on all Defendants for the intentional and/or negligent conduct of their employees, agents, and apparent agents and of third parties on the premises.

82.  On or about June 11, 2017, Defendants by themselves and through the acts and/or omissions of their employees, agents, and apparent agents breached their duty to exercise reasonable care to protect Plaintiff against dangerous conditions or activities which they knew or should have known to be present at the Federal Heights Sonic Drive-In restaurant by allowing a third party with a propensity for violence to enter a secure, employee-only building, thereby aiding and abetting the assault of an employee.

83.  But for the acts and omissions of Defendants and their employees, agents, and apparent agents in granting the assailant access to the secure building on the premises, the harm suffered by Plaintiff would not have occurred.

84.  Defendants had a pattern and practice of failing to enforce security policies enacted to ensure the safety of invitees on the premises, even though Defendants knew or should have known that their failure to enforce these policies was likely to result in harm to invitees. Defendants' failure to provide security against dangers of which they knew or should have known was willful and wanton.

85. As a direct and proximate result of Defendants' breach of their duty to exercise reasonable care, as set forth above, Plaintiff has suffered economic damages and emotional injuries with physical manifestations, including but not limited to post-traumatic stress disorder, mental anguish, nausea, weight loss, and anxiety. Defendants' breach of their duty to exercise reasonable care was a substantial factor in producing Plaintiff's injuries.

86. Plaintiff's injuries were preventable, foreseeable, and will continue indefinitely into the future.

**SECOND CLAIM FOR RELIEF**
**Vicarious Liability of All Defendants for the Negligence of its Agents[1]**

87. Plaintiff incorporates by reference all allegations in each preceding and subsequent paragraph as if fully set forth herein.

88. Shevlin was Defendants' authorized agent acting in the course and scope of her employment. Defendants were responsible for the condition and daily operations of the Federal Heights Sonic Drive-In.

89. At all relevant times, Defendants owed Plaintiff a duty to exercise reasonable and ordinary care to keep and maintain the restaurant in a reasonably safe condition. In particular, Defendants had a duty to take such precautions as were reasonably necessary to protect Defendants' employees from criminal and/or intentional acts that were reasonably foreseeable.

90. Defendants' management breached this duty by permitting a third party to enter a secure, employee-only area of the Federal Heights Drive-In where Plaintiff worked, even though it knew that the individual was angry at Plaintiff, had a propensity for violence, and intended to physically harm Plaintiff. This conduct created an unreasonable risk that Plaintiff would be harmed.

91. As a direct and proximate result of Defendants' breach of this duty of care, Plaintiff has sustained economic damages and emotional injuries, including but not limited to post-traumatic stress disorder, mental anguish, and anxiety.

92. Defendants' breach of their duty to exercise reasonable care was a substantial factor in producing Plaintiff's injuries.

93. Defendants' negligence caused Plaintiff the harm described above.

94. Defendants are liable for the conduct of their agents.

---

[1] Plaintiff recognizes that the Premises Liability Act preempts common law torts and therefore pleads all other claims in the alternative to the PLA. In the likely event that Plaintiff's PLA claim is upheld or not challenged, Plaintiff will amend his Complaint to withdraw all non-PLA claims.

### THIRD CLAIM FOR RELIEF
### Negligent Retention, Training, and Supervision (Against All Defendants)

95. Plaintiff incorporates by reference all allegations in each preceding and subsequent paragraph as if fully set forth herein.

96. At all relevant times, Defendants' employees, including but not limited to their management at the Federal Heights Sonic Drive-In, were under Defendants' employment, direction, control, and/or supervision.

97. Defendants owed a duty of care to Plaintiff to exercise reasonable care in the retention, training, and supervision of their employees, managers, agents, and apparent agents in the exercise of their job functions and the management of the premises.

98. In the exercise of reasonable care, Defendants knew or should have known that their employees, managers, agents, and apparent agents, including Shevlin, posed a risk of harm to their employees by regularly permitting third parties to enter secure, employee-only areas of the restaurant, where they could injure employees, and that the harm that occurred to Plaintiff, including the intentional assault by a third party, was a foreseeable manifestation of that risk.

99. Defendants breached their duty of care, as described above, by failing to exercise reasonable care in the retention, training, and supervision of their employees, managers, agents, and apparent agents, when they knew or should have known that such individuals posed a risk of harm to their employees, including Plaintiff.

100. As a direct and proximate cause of Defendants' breach of their duty of care, as set forth above, Plaintiff has sustained economic damages (i.e., loss of income and past and future medical expenses) and emotional injuries, including but not limited to post-traumatic stress disorder, mental anguish, and anxiety. Defendants' breach of their duty to exercise reasonable care was a substantial factor in producing Plaintiff's injuries.

### FOURTH CLAIM FOR RELIEF
### Outrageous Conduct (Against All Defendants)

101. Plaintiff incorporates by reference all allegations in each preceding and subsequent paragraph as if fully set forth herein.

102. By knowingly aiding and abetting a violent, angry attacker's assault on an employee in a secure, employee-only area of his workplace, Sonic engaged in extreme and outrageous conduct.

103. Sonic did so with reckless disregard for Plaintiff's rights or with the intent of causing Plaintiff severe emotional distress.

104. Sonic's conduct foreseeably caused Plaintiff severe emotional distress.

105. Sonic's conduct was so outrageous in character and so extreme in degree that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency, and utterly intolerable in a civilized community.

106. Sonic is vicariously liable for the actions of its managers and agents.

107. The actions or omissions of each Sonic Defendant were the legal and proximate cause of Plaintiff's damages.

108. Plaintiff has been and continues to be damaged by Sonic's outrageous conduct, including but not limited to severe mental and emotional distress.

## VI.  RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against all Defendants, and award the following relief, to the fullest extent allowed by law:

a. Declaratory and injunctive relief, as appropriate;

b. Actual economic damages as established at trial;

c. Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d. Punitive damages for all claims allowed by law;

e. Pre-judgment and post-judgment interest at the highest lawful rate;

f. An amount which will gross up any award as an allowance for tax consequences;

g. Attorneys' fees and costs as may be allowed by law and by order of this Court; and

h. Such other and further relief as shall be deemed just and proper by this Court.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 22nd day of May 2019.

                         Respectfully submitted,

                         KING & GREISEN, LLP

                         *s/Paula Greisen*

                         Paula Greisen
                         Jennifer Weiser Bezoza
                         Jonathan Freund
                         KING & GREISEN, LLP
                         1670 York Street
                         Denver, Colorado 80206
                         (303) 298-9878 telephone
                         (303) 298-9879 facsimile
                         bezoza@kinggreisen.com
                         greisen@kinggreisen.com
                         freund@kinggreisen.com

                         *Attorneys for Plaintiff*

**Plaintiff's Mailing Address:**

Jonathan Carter
2800 W. 103rd Avenue, #2121
Federal Heights, CO 80260